IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| DEDRA SOUTHARD, Individually | § | |
| and as Independent Administrator of | | |
| the ESTATE OF TROY LEE AYLOR, | § | |
| and DeWAYNE AYLOR | | |
| vs. | § | NO. 7:06-CV-011-R |
| UNITED REGIONAL HEALTH | § | |
| CARE SYSTEM, INC. dba UNITED | | |
| REGIONAL HEALTH CARE SYSTEM | § | |

## MEMORANDUM AND ORDER

This is a case brought by Plaintiffs under the Emergency Medical Treatment and Active Labor Act (**EMTALA**), Title 42, USCA § 1399(d)(B) properly called the "Anti-Dumping Act." Plaintiffs are the survivors of Troy Lee Aylor ("**Aylor**") who died shortly after being discharged from the Emergency Room of United Regional Health Care System ("**Hospital**"). Plaintiffs claim that Hospital failed to provide Aylor with "adequate medical screening" and discharged him while he was in an "unstable emergency medical condition," thereby contributing to or causing his ultimate death. Plaintiffs assiduously assert that they are not bringing a medical malpractice action.

This is not the first discovery dispute among the parties. In 2006 Plaintiffs propounded a set of interrogatories and discovery requests to the Hospital, to which the Hospital levied numerous and various objections. Following a hearing on Plaintiffs' first Motion to Compel, on December 6, 2006 this Court entered an order disposing of the Hospital's objections (docket entry #23) and directed supplementation of the Hospital's answers and production responses. Thereafter, in May 2007 Plaintiffs propounded a second set of interrogatories with production requests to the Hospital. Once again the Hospital answered with a battery of objections and qualifications of its answers and

responses to the second set of discovery requests. And again, Plaintiffs have filed a second Motion to Compel (docket entry #35). The Motion was specially referred to the undersigned by Order of Reference by the Honorable Sam Lindsay who had been assigned the case following the former judge's recusal. Plaintiffs' Second Motion was accompanied by a Brief and extensive Appendix. Within the court-ordered shortened response time, Defendant Hospital timely filed its Response with an accompanying Brief and extensive Appendix composed of affidavits of Hospital personnel setting forth factual information regarding the burdensomeness upon the Hospital to meet Plaintiffs' various interrogatories and production requests. Plaintiffs timely supplemented its Appendix with copies of the pleadings filed during the interim and with another Brief. A lengthy telephone conference was conducted on August 8, 2007 with a court reporter present at the Magistrate Judge's office to make a record and transcript of the proceedings.

After reviewing the parties' written submissions and the arguments of counsel, I find and conclude as follows:

1. First out of the chute the Defendant has objected to the Plaintiffs' definitions of terms and phrases set forth in the production requests and interrogatories. Defendant assets that the definitions are "self-serving and expand or alter the Federal Rules of Civil Procedure." This is especially so, the Defendant assets, where the definitions relate to words of common usage within the English language. Defendant's arguments seem a bit disingenuous since Defendant has previously argued that the term "symptom" was too broad and undefined. See Defendant's Reply Brief on prior Motion to Compel, docket entry #20. Plaintiffs respond by observing that Defendant has levied no objection as to the correctness of the definitions, but only that they may be too "tight," not allowing the Defendant any wiggle room. Plaintiffs ardently argue that experience in the past,

both with this Defendant and with others in other cases, reflect that unless definitions are employed with inclusive tight language, the Defendant here, and defendants generally, can engage in semantic games so as to skirt their production and/or response obligations.

Finding nothing untoward or erroneous with the language adopted in the terms and phrases used by Plaintiffs, I conclude that Defendant's objections thereto should be, and are hereby, **OVERRULED**.

2. Turning now to Defendant's substantive objections to production of the Hospital records of patients other than Aylor, this is not the parties' first rodeo, and not even their first event in the second rodeo. Plaintiffs' counsel and the Hospital's counsel have locked horns over the same and similar issues before Magistrate Judge Bleil last year in *Martinez v. Porta*, 2006 WL 3289187 (N.D. TX). Magistrate Judge Bleil's decision was affirmed by Judge Terry Means over the Hospital's objections. In *Martinez*, also an EMTALA case arising from the death of a patient discharged from the Hospital's Emergency Room, Judge Bleil ordered the production of medical records of "each person who was a patient in the Emergency Dept... <u>and presented with symptoms similar to Martinez' or received cardiac-type treatment,</u>" but reduced the time period sought by the Plaintiff from six years to three years predating Martinez' discharge from the Hospital. Judge Bleil also made further restrictions and modifications of the production requirements. In affirming Judge Bleil's decision, Judge Means iterated that under EMTALA a hospital must provide "appropriate" medical screening. Appropriateness is adjudged by whether the screening at issue "was performed equitably in comparison to other patients with similar symptoms" citing <u>Marshal v. E. Carroll Parish Hospital</u>, 134 F.3d 319, 322-24 (5th Cir. 1998). Since Judge Bleil had incorporated special confidentiality protections in his Order for disclosure of the medical records (paraphrasing the exact

language of the exceptions permitted under HIPAA), Judge Bleil had no difficulty in disposing of the Hospital's privilege/confidentiality objections. Texas Health & Safety Code §161.032; *Irving Healthcare System v. Brooks*, 927 SW 2d 12 (Tex. 1996)

In this case, Plaintiffs have restricted their interrogatories and production requests to a single one-year time period immediately preceding Aylor's death. Plaintiffs have identified and articulated seven symptoms they allege Aylor presented to the ER personnel and have likewise identified and articulated two cardiac tests that had been administered to Aylor (an ECG/EKG and a cardiac enzymes test). Under the holdings of the Supreme Court, the Fifth Circuit and the Judges of the Northern District of Texas, "appropriateness" is measured by comparison to other patients and their symptoms and to an extent by the scope of the Hospital's screening protocol. If the Hospital's screening protocol for the Emergency Room were merely a flip of the coin, that protocol would not be "appropriate screening," even if used consistently among all patients presenting to the Emergency Room. On the other hand, a hospital is not required to perform every single bodily function test for every person who presents to the Emergency Room, even if such protocol were equitably applied to all patients. The appropriateness of screening is necessarily dependent upon the symptoms presented, the tests run, the diagnoses made and the actions taken after diagnosis. Necessarily, a comparison must be made between or among the symptoms presented by Aylor, the tests run and the diagnoses made as compared to other patients. It is not every patient other Aylor who presented at the ER that is appropriate for comparison. Similarly, it is not just patients who presented all of the seven symptoms alleged to have been presented by Aylor to whom comparison should be made. Plaintiffs have struck a fair balance among these extremes within their production requests and interrogatories. Plaintiffs have tied their discovery requests to symptoms presented, tests run and

diagnoses made. *See* Production Requests B-1 through B-7 and Interrogatories Numbers 1 through 7.

The Hospital has records of each of the patients who presented to the ER during the designated time period. The identity of such patients is readily determinable without significant burden by the use of the Hospital's computer system which reveals patient names and their account and/or record numbers. The records of such patients also generally and often reflect the symptoms presented, the tests administered and the diagnoses made. These symptoms, tests and diagnoses have been assigned codes that are searchable by the Hospital's computer, either individually or by combination. Thus, it appears, and I find, that the Hospital can readily, promptly and without significant burden, identify the names, chart numbers/account numbers of patients who presented to the Hospital during the relevant time period, presented one or more of the symptoms presented by Aylor, and received one or more of the tests and/or diagnoses received by those patients. I find that the documents requested by Plaintiffs in their Production Requests Nos. B-1 through B-7 are relevant, indeed, crucial, for the Plaintiff to make the appropriate comparison mandated under EMTALA. Therefore, I conclude that Defendant's Objections to Interrogatories Nos. 1 through 7 and Production Requests Nos. B-1 through B-7 should be, and are hereby, **OVERRULED**.

3. By Interrogatories Nos. 10 and 11 and Production Requests Nos. 10 and 11, Plaintiffs sought records of persons who had been admitted to the Hospital's Critical Care Unit (**"CCU"**) or Progressive Care Unit (**"PCU"**) "to rule in or rule out" certain conditions. I find that the Hospital's computer records were not "coded" in such a manner as to allow a computer search to identify the persons whose records are responsive to discovery Requests 10 and 11. To make the determination of the purpose for the referral to the CCU or PCU would require an interpretation of the medical

records of all of the Hospital patients who had been admitted to CCU or PCU during the relevant time period. That determination requires medical judgment by a medical professional which I find to be overly burdensome to the Defendant with marginal relevance to the Plaintiffs. Accordingly, Defendant's Objections as to relevance and burdensomeness of Production Requests Nos. B-10 and B-11 are **SUSTAINED**. Defendant's other objections thereto are overruled.

4. By Production Requests Nos. B-8 and B-9, Plaintiffs seek review of the chart of each person who presented to the ER during the relevant time period whose chart "contains a copy of the Hospital's 'Chest Pain Care Management Guidelines,'" (**"Guidelines"**) either signed or unsigned by the attending physician. Those Guidelines, though in existence during the relevant time period, and though included within the chart of some patients who presented to the ER during the relevant time period, are not coded in the Hospital computer system to be used as search terms to identify patient charts in whose files such Guidelines are physically filed and/or were signed. Searching through all of the records of all of the patients who presented to the ER to locate only those in which such Guidelines were physically included and/or signed would consume too much time and effort and would be overly burdensome to the Hospital. The physical inclusion or exclusion of such Guidelines from the charts of some ER patients may have statistical relevance to the Plaintiffs' case[1], but that statistical relevance is marginal in comparison to the burdensomeness requiring the Hospital

---

[1] At the end of the day, all the examination of all those charts to determine the inclusion *vel non* of signed or unsigned copies of the Guidelines within the chart would simply produce a statistical number (i.e., a percentage) that the Plaintiffs might use to support their comparability analysis and presentation on the disparate treatment issue. That percentage could be derived at by Plaintiffs in a lesser examination of a large sample of patient charts. Since this Court has directed the Hospital to produce the charts responsive to Production Requests Nos. B-1 through B-7, that estimated sample size was approximately 532 charts. That sample is statistically large enough to produce a meaningful result.

to examine all the records to locate those particular files. I find that the Hospital provided sufficient proof of the burdensomeness of producing the requested documents. Accordingly, Defendant's Objections as to relevance and burdensomeness of Production Requests Nos. 8 and 9 should be, and are hereby, **SUSTAINED**. All of Defendant's other objections to said Requests should be, and are hereby, are **OVERRULED**.

5. By Production Requests Nos. C-1 and C-2, Plaintiffs sought the original credentialing file and/or any original record related to the credentialing of Armando Todd Moreno, M.D., the physician who saw patient Aylor in the ER. The Hospital resists the production of the credentialing file on the grounds that since Plaintiffs have assiduously asserted that this is an EMTALA case and not a medical malpractice case, the credentialing process and credentialing files of Moreno are wholly irrelevant and protected from disclosure by Texas statutory privilege and Moreno's own privacy rights. Furthermore, Defendant has produced the Affidavit of one of its record keepers to the effect that there is nothing in Dr. Moreno's credentialing file that in any way relates to the Aylor incident. Plaintiffs responds that under EMTALA the Hospital is "responsible" for the conduct of Moreno as a staff member either as an employee or independent contractor, since he performed the screening of patient Aylor; that as the "responsible" person his previous qualification and performance history are or may lead to admissible evidence; and that Plaintiffs do not trust the Hospital's employee to tell the truth in her affidavit following her examination of Moreno's credentialing file, especially since her chosen Affidavit language seems to be "tailored" to make it appear that the file contains no incriminating/relevant materials. I find that the Texas legislature has adopted a strong public policy against the willy nilly disclosure of physicians' credentialing files, and that since this case is an EMTALA and not a medical malpractice case, the physician's

qualification and/or disciplinary history is wholly irrelevant, specially where there is no reference to the Aylor incident. I conclude that Plaintiffs' Production Requests No. C-1 and C-2 are outside the permitted scope of discovery under Rule 26b; and that Defendant's objections thereto should be, and are hereby, are **SUSTAINED**.

6. Next out of the chute is Defendant's challenge to Plaintiffs' Production Request A-1 directed toward Hospital's policies and procedures with regard to its PCU. First, the Defendant says that its PCU procedures manual does not have a "table of contents" and the term "similar document" is too "ambiguous." I find that the phrasing of the production request is not ambiguous, especially since the Hospital should know darn well the name and/or category under which it maintains its PCU written policies or procedures, certainly better than the outsider Plaintiffs would. Accordingly, I conclude that Defendant's objections to Production Request No. A-1 should be, and are hereby, **OVERRULED**.

7. Defendant then levied objections to the production requests directed toward the equipment and equipment manufacturer of the device used to test patient Aylor's cardiac enzymes level when he presented at the ER on August 29, 2004. Plaintiffs' request regarding the equipment and manufacturer are set out in Production Requests Nos. 2, 3, 4 and 5. Defendant has hopped on these Production Requests as being (i) vague, (ii) unclear, (iii) too broad, (iv) overly broad, (v) so overly broad as to be burdensome, and then Defendant jumps off and provides the documents responsive to the requests. The essential thrust of Defendant's argument is any documents that relate to the device used by the Hospital to evaluate cardiac enzymes (indeed even the device used to analyze patient Aylor's own cardiac enzymes) are wholly irrelevant to the EMTALA cause of action as to justify the production of the documents, Plaintiffs counter this by suggesting that the Hospital's

"screening" procedure was simply to plug patients like Aylor into a cardiac enzyme machine and let it make the screening and/or diagnostic decisions. Plaintiffs also surmise that the manuals and other documentation provided by the manufacturers of the cardiac enzyme testing devices may actually contain the "screening" protocols that were then incorporated by reference in (or as) the Hospital's "screening" protocols.

Although this supposition smacks of a fishing expedition, I find that "cardiac enzyme testing and evaluation" will likely be the subject matter of extensive testimony and evidence during the trial and that the items sought by Plaintiffs' Production Requests Nos. A-2 through A-5 are relevant and may lead to admissible evidence under Plaintiffs' theory of the case. Accordingly, I conclude that each and every Objection of Defendant to Production Requests Nos. A-2 through A-5 should be, and are hereby, **OVERRULED**.

By reason of the overruling of certain of Defendant's objections, Defendant is required to supplement certain of its Answers and produce certain of the documents requested. **IT IS ORDERED** that Defendant supplement its Answers to Interrogatories and produce the requested documents on or before September 15, 2007. All original patient documents shall be produced at the business office of Defendant Hospital which shall make examination room(s) available to Plaintiffs' representatives for such reasonable period or periods of time as Plaintiffs' counsel deems necessary to examine said records.

Since by other parts of this Order I have directed the Hospital to produce certain medical records of certain of its patients, the confidentiality of those medical records should be maintained by the following protective order.

This Protective Order shall govern the inspection, production and use of protected health

information that may be disclosed by Defendant by reason of Plaintiffs' review of documents produced by Defendant in discovery in this cause:

(1) No party shall use or disclose protected health information, including information contained in patients' charts to be inspected, for any purpose other than the litigation for which such information was requested. *See* 45 C.F.R. 164.512(e)(1)(v)(A).

(2) At the end of the litigation, Plaintiffs shall return to Defendant URHCS any and all protected health information (including copies thereof). *See* 45 C.F.R. 164.512(e)(1)(v)(B).

(3) Counsel for the parties shall give notice of this Order and its terms to each person to whom protected health information is disclosed by them, and each such person shall be required to comply with the provisions of this Order.

**IT IS SO ORDERED**, this 14th day of August, 2007.

_____
**ROBERT K. ROACH**
**UNITED STATES MAGISTRATE JUDGE**